## PARKER *v.* COMMONWEALTH.

Under the constitution of Pennsylvania, legislative power must be exercised by the legislature created by that constitution. Hence, the act of 1846, giving the citizens of certain counties the power to decide by a vote whether the sale of vinous and spirituous liquors shall be continued within such counties, and imposing a penalty for the sale of such liquors, where a majority of the votes had been against such sale, is unconstitutional and void.

In error from the Quarter Sessions of Allegheny county.

*Oct.* 11. The second count in this indictment, on which alone the cause was tried, averred that the defendant, in the year 1847, within the fourth ward of Pittsburgh, (in which ward there had been given a majority of votes " against the sale of liquors,") sold rum, &c., without having first obtained a license for that purpose. The plea was not guilty. The paper book then set forth the admissions by the parties that defendant, residing in said ward, had sold spirituous liquors in 1847; and that in said ward an election was held according to the act of April 7, 1846, authorizing a decision by the citizens, by ballot, whether the sale of such liquors should be continued in said counties, and a majority of votes was given against the sale of liquors; and that defendant had not obtained a license from the Quarter Sessions as a storekeeper or apothecary to sell vinous and spirituous liquors for medicinal and sacramental purposes, and to be used in the arts. It was also admitted that defendant had taken out a license from the treasurer of the city of Pittsburgh, for vending foreign merchandise and liquors, agreeably to the act of 7th April, 1830, which license was taken out in 1847, and had not expired at the time of the alleged sale.

The only points are, whether the act of 7th April, 1846, applied to the wards of Pittsburgh; and if so, whether it was constitutional; and these, the court below ruled against the defendant.

*McCandless* and *Wood*, for plaintiff in error.—The act in question is highly penal and disabling; it is, therefore, to be construed strictly: Smith *v.* Spooner, 3 Pick. 229 ; Commonwealth *v.* Fourteen Hogs, 10 Serg. & Rawle, 395 ; American Fur 'Company *v.* United States, 2 Peters, 367 ; Stewart & Commonwealth, 10 Watts, 309 ; United States *v.* Wilson, Bald. 101. That this is the tendency of the statute is plain ; since, by a bare decision of a majority of the citizens of a particular place, a lawful business is rendered unlawful under the penalty of a heavy fine. The statute may then fairly be construed not to extend to this case, which is within the city, where the vote has been taken by wards. The words are, "the citizens of the boroughs and townships," which need not extend to wards of cities. Nor can it be supposed to extend to the case of a merchant, but rather to retailers of the prohibited article.

By the act of 1830, the license under which the defendant justified was authorized to be issued by the *city* treasurer. The act of 1846 prohibits a license by the county treasurer. There is, therefore, ample room for a distinction.

But the main question goes to the root of the matter ; and it is, whether the legislature can ordain a new, or different, legislative power from that provided by the constitution. That must consist of a Senate and House of Representatives, and they have no right to create this *imperium in imperio*.

This principle is further supported by the 2d and 20th sections of the Bill of Rights, which, recognising all power to be inherent in the people, declares there are certain persons invested with the powers of government. It is plain that every citizen is entitled to the protection of the whole legislative body, and is not to be left by them to the tender mercies of his particular neighbourhood. It is, moreover, plain that the distinguishing feature of our government is, that the people can only act through their representatives, and not, in the first instance, in primary assemblies. Here, then, the legislature have, in fact, created a new constitution, under which the people of each township and ward are the legislative body.

*Forward* and *Alden*, contrà.—As to the scope of the act of 7th April, 1846, and its application to cities, it suffices to say that the word *city* is not mentioned at all in the act ; but the word "ward" is mentioned in every section thereof. If, then, cities be excluded, the word "ward" must be rejected altogether from the act. The term *ward* applies to the political divisions of a borough or city.

Under this act the citizens are not to vote by cities, but by boroughs, wards, and townships.

This law was affirmed by overwhelming majorities in every ward of both of the cities, at the first election held under its provisions.

The 1st section of act of 1830, (Purdon, 1019,) provides only a form of a license to be issued by the county treasurer.

As to the constitutionality of this law. This question has been treated as if the government of this state was one of enumerated powers, and must have express authority for every thing it does. This position is denied; the government is one of limited powers, and the legislature has authority to do every thing not prohibited by the constitution.

The 1st section of 1st article of the Constitution of the United States shows the difference between the powers given by that constitution to Congress, and the powers given to the legislature of this state by its constitution. The legislature has no specific authority in the constitution to levy taxes, make penal laws; yet, the right to do both has never been questioned.

It is conceded the legislature may prohibit the selling of liquors, except under a license. But this act is objected to, because it was referred to the people to affirm the law at their elections—thus giving to the people legislative power. The legislature only felt themselves constrained to restrain, to some extent, the vending of liquors.

By the act of 1834, (Dunlop, 523,) the old law, leaving the discretion of granting a license to the judges of the Quarter Sessions, was changed, and a certificate had to be presented to the court signed by twelve freeholders. This is legislative power: McCullough v. State of Maryland, 4 Wheat. 437.

There are a great many acts of Assembly passed submitting the act to the citizens of different townships and counties to determine, whether they would accept or refuse the provisions of the different acts. This is clearly giving the people legislative power: Rose v. Stuyvesant, 8 Johns. 426. As to what is a municipal corporation: City of London v. Woods, 12 Modern, 686.

The authorities of Pittsburgh are authorized to license brokers, and to prohibit persons to act as brokers unless licensed. An indictment for infraction of an ordinance of the city of Philadelphia, was held good in Commonwealth v. Duquet, 2 Yeates, 493.

The legislature has power to establish municipal corporations, and to give them power to make regulations and laws for the purpose of carrying out the object of such corporations. Every select

and common council is a local legislature, passing laws binding only within their respective cities.

What better method could be devised to procure a proper restriction in the selling of liquors, than the one adopted in the act of 7th April, 1846. And it cannot be said to give more legislative power to the people, than the provisions of the common-school law, and many other local laws passed by the legislature.

*Nov.* 8. BELL, J.—The defendant below, plaintiff in error, having been convicted upon an indictment, framed under the act of 7th of April, 1846, entitled " An act authorizing the citizens of certain counties to decide by ballot whether the sale of vinous and spirituous liquors shall be continued in said counties," the point is raised in this court whether the act is, in truth, a law of binding force.

It is to be regretted that this very grave constitutional inquiry, as it is presented to us, is interwoven with a question of public morals which has stirred the hearts and occupied the minds of the American people with such intensity of feeling, as to make it difficult to consider any proposition, even accidentally connected with it, in reference to its abstract merits alone. In approaching the discussion of such a proposition, the mind is almost involuntarily drawn to contemplate the amelioration which active philanthropy has, within a few years, effected in the social habits of our widely spread community; and the inquirer is tempted to shrink from the discharge of a task imposed by the deepest sense of duty, lest the result of his investigations might, even incidentally, check the growth of private and public improvement. But though the point presented for decision is highly important, considered simply in its connection with the subject I have alluded to, it becomes of infinitely greater magnitude when it is regarded as a question in political philosophy, springing from the peculiarities of our modes of government. In this aspect, it is intimately associated with the practical operation upon society of the written constitution, not only of this Commonwealth, but of every other state of the confederacy. Reaching far beyond any single subject of legislation, it embraces the whole range of topics that may fall under legislative cognisance, and, as it may be decided, restrains or immeasurably enlarges the manner in which the legislative power may be exercised. Such is the nature and scope of the subject to which our attention has been invoked. Regarding it as perhaps the most important ever presented for adjudication here, involving principles

that address themselves with great urgency to the interests of every member of society, we have considered it under a lively sense of the responsibility which, even in ordinary instances, attaches upon an inquiry into the constitutional action of the legislative body; but which is largely increased by the character and possible results of the present investigation.

Unlike that of the United States, the government of Pennsylvania is not one of enumerated powers. Still, it is a government of limited authority ; and it is, therefore, not to be denied that the action of its legislature may be invalid, though it contravene no express provision of the constitution, if it be in violation of the spirit of that instrument, and the genius of the public institutions designed to be created by it. Indeed, it is this species of insidious infraction that is more to be feared and guarded against than direct attacks upon any particular principle proclaimed as a part of the primordial law : for attempts of the latter description will, generally, be met by instant reprobation, while the stealthy and frequently seductive character of the former is apt to escape detection, until the innovation is made manifest by the infliction of some startling wrong. Putting out of view, as far as possible, the particular object of the act which gives rise to the controversy, lest we be misled by the meritorious nature of its aim; and addressing ourselves to the reasoning which must be equally applicable to all similar instances of legislative action, we will inquire whether there has been such an encroachment upon the constitution of the state, and the admirable political system created by it, as calls for the interposition of this court. In doing so, we are necessarily led into an examination of the structure of our systems of civil polity and government; and the aim and object of the eminent men who were charged with the important task of giving them a visible and distinctive shape.

The earliest pages of our colonial history show, that from the beginning, the principles of civil and political liberty were understood and practised by those who planted the germ of civilized society in this country. It is true, that acknowledging allegiance to a monarch and subservience to a foreign parliament, to which they conceded the *jura summi imperii*, the supreme and absolute authority, which, as it is said, must reside somewhere in every state, they did not formally claim as true the axiom, that all power emanates from the people. But, practically, for all the purposes of internal rule, this principle was to a great extent acted upon. The form of government in the several colonies very

soon resolved itself into the system of legislation by agents selected by the people, to whom a liberal right of suffrage was accorded; and thus our early political institutions, almost everywhere, assumed the resemblance of a representative democracy.   The American Revolution introduced a new feature into the science of government, before speculated upon by theorists, but then, for the first time, formally and solemnly announced as constituting an important element in the political constitution of a nation.   It is, in the language of our own bill of rights, in this respect, but an echo of prior declarations, that "all power is inherent in the people, and all free governments are founded on their authority, and instituted for their peace, safety, and happiness."   But though it was thus proclaimed, that the sovereign power resided in the body of the people, and that the only legitimate end of government is the promotion of their welfare, the utter impracticability of a personal and immediate exercise of this power by them, in the administration of the affairs of government, forbade the idea of a pure democracy. If such a form of civil rule can exist in a civilized community, it must be, as is well observed by an acute writer on this subject, when the limits of a state are so confined, that the people can assemble as often as may be requisite for the administration of the public concerns from every part of the state; but such a state must have too small a population to protect itself against the hostile designs and attacks of powerful or ambitious neighbours, or too small a territory to support the number of its inhabitants : either of which circumstances must continually endanger its safety and independence.   Our widely-extended country and numerous population concurred, even in the early days of the republic, to put this simple form of administration out of the question.   But had these reasons been wanting, other important objections would have interposed to prohibit the immediate exercise of administrative authority by the mass of the community acting directly on the subject. Among these may be mentioned the necessarily uncertain and fluctuating character of popular decisions, induced by the excitement of collision, and often by unreasoning passion and prejudice ; the violent commotions to which popular ass mblies are constantly exposed, especially when acting under the influence of party zeal, inflamed by the seductions of factious eloquence and artful sophistry ; the difficulty, if not impossibility, of deliberation and consultation, and above all, the imminent danger that, in the absence of a sense of responsibility, the surest guaranty of social justice, the rights of the minority would be disregarded by a majority seeking

only the gratification of its own desires, or the advancement of its peculiar opinions. In discussing proposed schemes of government, these objections had not escaped the public attention, of, which the public debates of that day give ample evidence. In proof of this, it may be sufficient to quote from Mr. Madison, whose enlightened predilection for popular institutions will not be questioned. In the course of the debates on the federal constitution, in the Virginia convention, he remarked, "that turbulence, violence, and abuse of power by the majority trampling on the rights of the minority, have produced factions and commotions, and these, in republics, more frequently than any other cause, have produced despotism." And, again, he observed, "if we go into the whole history of ancient and modern republics, we shall find their destruction to have generally resulted from these causes. If we consider the peculiar situation of the United States, and go to the sources of that diversity of sentiment which pervades its inhabitants, we shall find great danger to fear that the same causes here would result in the same fatal effects which they produced in those republics." This was but an expression of the prevailing sentiment. In accordance with it, though all the written constitutions framed by the several states of the confederacy acknowledged the sovereignty to reside in the mass of the people, its exercise by them was, either expressly or by necessary implication, confined to the establishment of the Constitution, the amendment of its defects, the correction of the abuses of government, and the choice of public servants. In the country from whence we derive our language and the great body of our law, the supreme power is conceded to be vested in the Parliament. There, sovereignty and legislation are said to be convertible terms: and, it is asserted, one cannot subsist without the other. But with us, the introduction of original written compacts, framed by the people themselves, has established a marked distinction between the indefinite and unlimited power of the community, considered as a whole, and the definite and limited power of the legislature. By these compacts, so much of the sovereign authority as is necessary for the making of laws, is delegated to the selected agents of the mass; but it must be exercised in the mode and manner pointed out by the compact itself. This observance is essential to the very existence of the constitution of a state; for that is the instrument by which the administrative authority is created, its powers defined, and their extent limited, the duties of the public functionaries prescribed, and the principles according to which the government is to be administered, delineated: Paine's Rights of

Man, part 1, p. 42; or, in the language of Judge Patterson, truthful as eloquent, 2 Dall. 308, "It is the form of government delineated by the mighty hand of the people, in which certain first principles or fundamental laws are established. The constitution is certain and fixed; it contains the permanent will of the people, and is the supreme law of the land; it is paramount to the power of the legislature, and can be revoked or altered only by the authority that made it. The life-giving principle and the death-doing.stroke must proceed from the same hands." . Until altered or destroyed by this authority, it is obligatory on the people themselves; and legislatures, which are merely its creatures, must conform to it, or their acts will be void. Every thing done in contravention of its principles is an act of usurpation, which, uncorrected, tends directly to its overthrow.

Mindful of the ancient institutions of the country, and following the example set by the Federal Constitution, the people of Pennsylvania, when ordaining and establishing a fundamental law for the government of the Commonwealth, decreed that the legislative power *shall* be vested in a General Assembly, to consist of a Senate and House of Representatives, to be elected at stated periods by the citizens of the respective counties. They thus solemnly and emphatically divested themselves of all right, directly, to make or declare the law, or to interfere with the ordinary legislation of the state, otherwise than in the manner pointed out in art. ix., sect. 20, which declares "the citizens have a right, in a peaceable manner, to assemble together for their common good, and to apply to those invested with the power of government for redress of grievances or other purposes, by petition, address, or remonstrance." This provision, which found a place in the constitution of 1790, is reiterated and re-established by the amended constitution of 1835, adopted by a vote of the whole people: thus conclusively showing that the experience of nearly half a century had worked no change in the sentiment which lodged the legislative authority of the Commonwealth in selected and responsible bodies of men, liable to the animadversion of their constituents, as the only safe depository of this portion of the sovereign power. Desiring to interfere no further with the regulated action of these bodies than in the mode thus expressly reserved, by the right of selecting the delegates composing them, and through the influence which inevitably flows from enlightened public opinion, deliberately and temperately expressed, the people sought to guard against an abuse of.the high power they had delegated, by providing a specific mode of election of members of the

Senate and House of Representatives; by prescribing their qualifications; by stipulating the separate and independent action of the two chambers; by an appeal to the conscience in the oath or affirmation exacted from each member to support the constitution of the Commonwealth, and to perform the duties of his office with fidelity; and by conferring on the chief executive magistrate the prerogative of the *veto*, designed for the correction of hasty and inconsiderate legislation. The system so established is a system of checks and balances, seeking safety in the declared responsibility of the individual agent, and the guardian watchfulness of the co-ordinate branches. The sedulous care exerted by those who devised it, to hedge it round with defences against the attacks of popular delusion and error from without, and to guard it against faithlessness and corruption from within, is visible in almost every line of the instrument that delineates it.

The authority conferred is, in its execution, of the greatest difficulty and delicacy, requiring, frequently, in its use, the nicest discrimination of cultivated and disciplined intellect; and as its active influence upon the interests of the community, for weal or for wo, cannot be resisted, it has been wisely lodged where experience taught it could be most safely and conveniently exerted.

To exercise the power of making laws delegated to the General Assembly, is not so much the privilege of that body as it is its duty, whenever the good of the community calls for legislative action. No man is bound, under the constitution, to accept the office of a legislator; but he who does so accept, cannot, rightfully, avoid the obligations it imposes, or evade the constitutional responsibilities incident to it. As has been well remarked, the constituent is entitled not only to the industry and fidelity of his representative, but to his judgment also, in all that relates to the business of public legislation. Among the primal axioms of jurisprudence, political and municipal, is to be found the principle that an agent, unless expressly empowered, cannot transfer his delegated authority to another, more especially when it rests in a confidence, partaking the nature of a trust, and requiring for its due discharge, understanding, knowledge, and rectitude. The maxim is, *delegata potestas non potest delegari*. And what shall be said to be a higher trust, based upon a broader confidence, than the possession of the legislative function? What task can be imposed on a man, as a member of society, requiring a deeper knowledge and a purer honesty? It is a duty which cannot, therefore, be transferred by the representative; no, not even to the people themselves; for they have forbid-

den it by the solemn expression of their will that the legislative power *shall* be vested in the General Assembly; much less can it be relinquished to a portion of the people, who cannot even claim to be the exclusive depositories of that part of the sovereignty retained by the whole community. An attempt to do so would be not only to disregard the constitutional inhibition, but tend directly to impress upon the body of the state those social diseases that have always resulted in the death of republics, and to avoid which the scheme of a representative democracy was devised and is to be fostered. Athens once possessed a government in a measure representative; but the decrees of its senate were subject to the supervision of the popular assemblies of the citizens, who, by progressive innovations, entirely changed the nature of the constitution, and introduced corruption, anarchy, and final destruction. The people of this Commonwealth, I repeat, have reserved to themselves the right to alter or abolish and reconstruct the political fabric; and may thus assume, if they. please, the direct control of ordinary legislation. But in the present advanced condition of political science, and recurring to the experience of the past, it is not to be presumed they will ever do so. Yet were this otherwise, it is not for their servants to anticipate the expression of such a will. The great question in this cause is, did the legislature of 1846 fall into this error? The proper solution of this question will be best determined by an inquiry into the nature of municipal laws, and ascertaining how far the act of Assembly under review squares with the definition of such laws.

Municipal law is declared to be a rule of civil conduct prescribed by the legislative power, which in England is called supreme, commanding what is right, and prohibiting what is wrong. "It is called a rule," says the great English commentator, "to distinguish it from advice or counsel, which we are at liberty to follow, or not, as we see proper, and to judge upon the reasonableness or unreasonableness of the thing advised; whereas our obedience to the law depends not upon our approbation, but upon the maker's will; counsel is only matter of persuasion—law is matter of injunction; counsel acts only on the willing, but law upon the unwilling also." This definition of a law is as strictly correct, applied under our institutions, as it is in Great Britain, with the single modification that here the maker's will is subordinate to constitutional injunction.

From a very early period in the history of Pennsylvania, laws have been enacted directing public houses of entertainment to be

licensed, with the privilege of retailing spirituous liquors and other intoxicating drinks. These were altered and modified from time to time, until, by the act of 11th March, 1834, which supplied and repealed previous enactments on the same subject, the several Courts of Quarter Sessions and Mayor's Courts within the Commonwealth were empowered to grant licenses for taverns or inns, to persons applying for the same, under certain regulations and restrictions; and the supplemental act of 21st March, 1841, made provision for the punishment of any person convicted of retailing vinous or spirituous liquors by less measures than one quart at a time. The act of 7th April, 1830, directed that every person who shall deal in the selling of any goods, wares, and merchandise, wines or distilled liquors of foreign growth or manufacture, except such as are sold by licensed auctioneers and by licensed tavern keepers, shall take out a license for vending such foreign merchandise or liquors from the treasurer of the proper city or county. Then comes the act of 1846, which gives rise to the present controversy. It provides, in substance, that it shall be lawful for the citizens of the several boroughs, wards, and townships, in certain counties named, including the county of Allegheny, at the annual election of constables and other borough and township officers, to decide by their votes, whether or not the sale of vinous and spirituous liquors should be permitted among them for the ensuing year; that whenever, in any of the said boroughs, wards, or townships, there shall be a majority of votes "against the sale of liquors," the Court of Quarter Sessions shall not, for the ensuing year, grant license to any inn or tavern, nor the treasurer of the county issue a license to any retailer of merchandise for the sale of vinous or spirituous liquors within said borough, wards, and townships for said year; that, if any person in said boroughs, wards, and townships, should, within one year, sell and deliver, or cause to be sold and delivered, any vinous or spirituous liquors to any person, except as provided in the acts, such person so selling shall be laible to be indicted, and, on conviction, forfeit and pay not less than twenty, nor more than one hundred, dollars; but, if any of the boroughs, wards, and townships, in the said county, shall, by a majority of votes, decide "for a sale of liquors," then the laws in force regulating the business of inns and taverns, and retailers of foreign goods and merchandise, including liquors, shall remain in force as if the act had not been passed. From this summary of its features, it will be perceived this act of the General Assembly, whether considered as an enactment of new and substantive provisions,

2 X

or as a statute of repeal, abrogating existing laws, depends for its validity and binding efficacy, within the several counties named in it, upon the popular vote of designated districts.   Without this affirmatively expressed, it is inert.   Possessing no innate force, it remains a dead letter, until breathed upon by the people and called into activity by an exertion of their voice in their primary assemblies.   Until then, it prohibits no act, creates no offence, points out no mode of trial, fixes no penalty, and, when so bidden into life, its existence as a rule of action, is limited to the brief period of a single year; unless new energy be again infused through the medium of the ballot-box.   If a majority within the particular district should vote negatively upon the question, yearly to be submitted to the people, the act, as a statute, has no existence.   It is not to be deemed a law within the district where such a vote is cast. If a majority of votes be cast in the affirmative, then the act is to take effect as a statute, establishing a new rule and repealing the old.   It operates not *propria vigore*, but, if at all, only by virtue of a mandate expressed subsequently to its enactment, in pursuance of an invitation given by the legislative bodies.   As it left the halls of legislation, it was imperfect and unfinished; for it lacked the qualities of command and prohibition absolutely essential to every law.   We have seen there can be no such thing as a law, unless it be mandatory and obligatory upon those who are to be the subjects of it, by a declaration of the legislative will.   From whence does the act of 1846 derive this mandatory and obligatory character?   Not from the legislature, for in the day of its enactment it possessed it not.   If it has that character at all, it must have been conferred by the *fiat* of a portion of the people expressed through their votes.   But the popular decree can only have worked this effect, because the citizens voting were, in some way, clothed with the power of ordinary legislation.   Now it cannot be pretended they possessed this power, unless they drew it from the invitation to declare their will by an exercise of the elective franchise.   If so, what is this other than a delegation of the legislative franchise by an act of the General Assembly?   But, as has been shown, this body was altogether incompetent to make such a transfer.   In delivering the judgment of the court of errors and appeals of the state of Delaware, in a case in all respects like the present, Chief Justice Booth remarked:  "The absurd spectacle of a governor referring it to a popular vote whether a criminal, convicted of a capital offence, should be pardoned or executed, would be the subject of universal ridicule; and were a court of

justice, instead of deciding a case themselves, to direct the prothonotary to enter judgment for the plaintiff or defendant, according to the popular vote of a county, the community would be disgusted with the folly, injustice, and iniquity of the proceedings." And yet these branches of the government derive their authority from the same instrument which confers the power of legislation upon the General Assembly, and are not more strongly restrained by its terms than is the latter body from devolving their duties and responsibilities upon others. But neither of these departments can absolve itself of the task appropriate to it, by substituting others not called to its discharge by the constitution. None of them can legally invite the people to exercise a function which the constitution makes the peculiar business of selected bodies of persons, and therefore, in effect, denies to every other person. Nor can they call to their aid the mass of the community, except in the modes prescribed by the fundamental law. To permit either of these courses, would be to loosen the hold of society from its greatest safety, by removing all accountability, and thus subjecting the minority to the unrestrained decisions of irresponsible and fluctuating majorities. In the present instance, the good proposed by the act of Assembly may blind the unreflecting to the ultimate consequences of the false principle upon which it proceeds; but the most indifferent and unobservant cannot but be startled by the reflection, that it is a principle capable of universal operation in the business of legislation, and may be in the end employed to procure the establishment of laws which a responsible legislature would not dare to enact. For an Assembly of two branches designed to hold each other in check, the smaller body being composed of members of an age greater than that required to give the right of suffrage, and the proceedings of both subject to the *veto* of an executive officer of still more matured years than the senator, will be substituted a mass of voters of every variety of mental capacity and training, many of whom may have barely attained the legal age of twenty-one years, from whose decision no appeal lies but to themselves, and whose action is subject to no *veto*.

Before the adoption of the constitution of 1790, great danger of inconvenience and injury was found to proceed from the exercise of the legislative function by a single House of Representatives. This was remedied by the erection of two co-ordinate houses, in imitation of the British parliament and of Congress, under the federal constitution. This example has, I believe, been followed

by every state of the confederacy; thus giving the universal assent to a system which long experience has tested as necessary to prevent rash, inconsiderate, and unjust legislation. But, if the two houses can divest themselves of their office of law-makers, and devolve it upon the body of the people, what security have we against the passage of laws, perhaps well meant, but liable to be glaringly wrong, because inconsiderately adopted? and what check is left us upon hasty and ill-advised zeal, open to be influenced and misguided by interested, cunning, or blind fanaticism? If the practice be sanctioned, there may follow a train of experiments which, unarrested at some point of their progress, must end in the final overthrow of the constitution. Every case of doubtful propriety will be referred to the result of a ballot; and acts of Assembly, subject to the popular vote, will be yielded to unthinking clamor or partisan importunity, by faithless legislators anxious to escape the responsibility of their position.

It is insisted, however, that the legislator, when contemplating important changes in the existing law, has not only a right to consult the opinions and wishes of the constituent, but ought to do so: inasmuch as in a country of free institutions the only security for the stability of the law is, that it rests in the approbation of those who are the subjects of it. This is not denied; and, in truth, in the practical working of our system, such is always the case. But the public opinion, when ascertained, must be adopted by the legislature in the form of a statute before it can have the force of a law; for, I repeat, to give to legislative action this effect, it must be by an expression of the legislative will alone.

But it is urged that this species of legislation, if it can with propriety be so called, has been legitimated by the habitude of years, obtaining without complaint or objection; and, in proof of this, our attention has been called to several instances in which the action of the General Assembly is thought to bear a near resemblance to that, which forms the subject of our inquiry. Were this so, it might make us further pause and hesitate to arrive at a conclusion, adverse to the validity of the action impeached in this case; but it would not justify us in declining to give expression to the conclusion, if it clearly appears that the legislature has transcended its legitimate authority. A bad precedent, suffered to pass *sub silentio*, cannot be set up to justify the continuance of an abuse in which it originated; and this is especially true where the question is of the constitutional exertion of a delegated power. A different rule would expose the fundamental laws of the state to

continual danger of subversion from a succession of encroachments, which, in the beginning, did not attract the public attention or invite its investigation—a consequence too momentous to be hazarded by unreasonable deference to tolerated mistakes. In questions of mere property, an inveterate error, which, by repetition, has attained to the dignity of a rule, may be tolerated: because an attempt to correct it would generally be productive of more mischief than will be worked by its continuance. But such an argument can have no place where the error committed touches, with the finger of corroding wrong, the political organization of a state and threatens its existence. In such a case, the duty of preserving the constitution intact is paramount to every other, and, irrespective of veteran abuses, so imperatively calls for the eradication of the canker, that the judiciary, which should shrink from applying the appropriate corrective, would be justly chargeable with a gross dereliction of duty.

But I apprehend, that, with perhaps the exception of a single class of instances of very modern origin, no such stumbling-block lies in the path of the present investigation. Even a cursory glance at the statutes cited will suffice to show that, in principle as in feature, they are totally unlike the act of 1846. And, first, the counsel for the Commonwealth have pointed to a supposed analogy existing in the case of municipal corporations clothed with the power of making by-laws for the conduct of its concerns and the government of its members. It is argued that this is legislation by virtue of an authority delegated by the legislative power—a right which has not only passed unquestioned, but received the express approval of this court in the case of The Commonwealth *v.* Duquet, 2 Yeates, 493; where it was decided that an act of Assembly, empowering the corporation of Philadelphia to pass ordinances to prevent persons from erecting wooden buildings within certain districts of the city, was constitutional. But the position assumed by the Commonwealth is based upon an entire misapprehension of the nature of the right to make ordinances—a right which is said to be necessarily incident to every corporation aggregate. By-laws, whether enacted in pursuance of express authority given by charter or without it, are no more than a species of contract between the individual members; and, in the case of municipal corporations, may be extended to a stranger who comes voluntarily within the jurisdiction, upon the principle that his coming is equivalent to an assent to be bound by the local law of the place. "Rules," says Mr. Kyd, in his treatise on corporations, "which

are to direct the general conduct, must be established by a majority of the wills of the whole community, or by the resolutions of a select body, to whom the whole community have delegated the legislative authority. These general rules, when applied to all the inhabitants of a country, united in an independent government, are called laws; when applied to subordinate communities, they are called private ordinances, or by-laws. All by-laws have their obligation from the consent, either express or implied, of the parties who are to be bound by them; and therefore every member of a corporation is bound by the by-laws of the corporation without express notice of them; nor is it an objection to his being bound by every particular by-law that he was not a member at the time it was made." In the case of the city of London *v.* Wood, 2 Mod. 686, cited by the Commonwealth, Lord Ch. J. Holt remarked that a city is to be considered " as a great community that have a legislative form intrusted to them for their better government, and can make laws to bind the property of those that live within that precinct, and also of all strangers whatsoever that come within the limits of their jurisdiction; and it was necessary and convenient that they should have such power for the support of their government, &c. For the supreme jurisdiction cannot have leisure to inspect into the small matters, that concern the whole order and regulation of matters within that society or community, as they that are members of it shall." But it is evident this eminent judge had in contemplation that which is the foundation of the right to make binding by-laws or ordinances; namely, the consent of the parties to be affected by them. It is on the ground of consent, too, that the minority is bound by the expressed will of the majority.

But how, when, or where have the minority of the people of Allegheny county agreed to be governed by the will of a majority of their fellows, except in the mode pointed out by the *constitution* of the state of which they are members? They have agreed they will be subject to the resolutions of " selected bodies of men to whom the community has delegated the legislative authority," when their decrees assume the character of laws, because endowed with the principle of action which only those selected bodies can confer. But there is no assent beyond this; and, therefore, the supposed analogy between the case of corporations exercising the right of enacting by-laws, and a delegation of authority to make rules for the government of the people of the state, or any portion of them, altogether fails.

The act of 1836, and its supplements, which established the system of common schools, is also pointed to as an instance of legislation by means of the popular vote. In respect to public education, an injunction was laid on the General Assembly by art. 7, sect. 1, of the constitution of 1790, and repeated by the amended constitution, to "provide by law for the establishment of schools throughout the state, in such manner that the poor shall be taught gratis." This duty was very imperfectly discharged, until the passage of the act of 1836. It erected every borough, ward, and township in the Commonwealth, out of the bounds of the city and incorporated districts of the county of Philadelphia, into a school district; and, in connection with subsequent statutes, points out, very minutely and specifically, the mode in which the system it provides should be carried into effect. School directors are to be elected in each district, and to be organized for the transaction of business by choosing a president, secretary, and treasurer, and they are charged with the business of conducting the details of the system. Of the public moneys, a school fund was set apart; which, from time to time, has been increased, to be distributed among the accepting school districts. The 13th section directs that an election shall be held, at stated periods, within each school district, at which, the question of establishing common schools shall be decided by the qualified voters of the district. If a majority of the ballots deposited shall contain the word "schools," the school directors are to proceed to establish schools agreeably to the provisions of the act; but if a majority shall contain the words "no schools," the system is not to go into operation within the particular district for a limited period. The act further provides for the holding of elections within such districts as may theretofore have accepted the system, and directs that, should a majority cast their ballots against its further continuance, it shall be suspended until a majority of the inhabitants, by their votes, otherwise decide. It is insisted that the power thus conceded to the people of the districts, to accept or reject the system of common schools, is of the same nature and character as that conferred by the act of 1846; and that this power has not only been beneficially exercised, without complaint or question; but that its legitimacy has been recognised and sanctioned by the people themselves, acting in their sovereign capacity. In proof of this, we are referred to the schedule appended to the amended constitution, adopted by a vote of the people in 1838, which declares, that "all laws of this Commonwealth in force at the time when the said alterations and amendments in the said

constitution shall take effect, and not inconsistent therewith," " shall continue as if the said alterations had not been made." If, indeed, that portion of the school law I have particularly noticed were in contravention of the constitution, the argument, so far as it is based upon any supposed action of the convention which framed it, or of the people in adopting it, would be shorn of its strength by the saving clause, " not inconsistent therewith." But it is unnecessary to combat the argument on this ground, for no such inconsistency exists.    The several acts of Assembly, constituting the common-school system, came from the General Assembly complete and perfect laws, drawing the principle of life from the creative power of the legislature, and looking to no other authority to invest them with the compulsive power of a rule.    A short examination of their scope, intent, and mode of operation, will make this manifest, and prove that, unlike the act of 1846, they do not make the repeal of former laws, and the creation of new substantial ones, to depend upon the fiat of the popular vote.    Under their provisions, each school district, upon the election of school directors, becomes *quasi* a corporation, entitled, for school purposes, to receive a share of the public donation from the treasury of the Commonwealth : upon the condition, that the inhabitants shall agree to levy a tax for the support of the schools within the bounds of the district.    It is true, that the citizens are called to decide by their votes, whether common schools shall be established within their precincts.    But for what purpose ?    Not to determine whether the acts of Assembly shall become laws. · The object of the vote is declared by the 4th section of the act of 1836, which provides, that " the school directors of every school district which has adopted the common-school system, or which may hereafter adopt the same, shall annually, on or before the first Monday of May, authorize to be levied such an amount of tax in said district as they may think necessary for school purposes; not less than equal to, nor more than treble the amount which the district is entitled to receive out of the annual state appropriation."    The succeeding sections, in connection with the act of 12th April, 1838, point out the manner in which the tax is to be assessed, collected, and applied.    An inspection of the statute will show that a vote accepting the system devised, amounts to nothing more than a declaration of a willingness to contribute an amount of money, by way of tax, equal to the public donation; and that a negative vote is but a refusal of the public money upon the condition proposed.    The proposition which the statutes make to the people of each of the school districts, is, there shall be paid to you

a certain portion of the public treasure for the establishment and support of schools, under the system devised by the legislature; provided, you will agree to authorize your school directors to levy upon your property a tax bearing a certain proportion to the amount of the donation; and in the event of your so agreeing, the school directors are hereby authorized and required to levy and collect the tax. It may, however, be objected that an agreement to levy a tax, by vote or otherwise, is in itself an exercise of the legislative power. But here an obvious distinction is to be observed. A law designating the persons, or bodies of persons, by whom a tax may be imposed, and the mode in which it shall be collected and distributed, requires the authority of the constitutional law-maker, for it is a rule of action prescribed. But the act of the designated persons or bodies depends, for its authority, altogether upon the law commanding or permitting it. Of the illustrations furnished by our statute-book of this distinction, may be mentioned, the laws empowering county commissioners and supervisors of townships to assess and levy taxes for county and township purposes, respectively. In these cases, deliberation, judgment, and discretion are to be employed, and there are many points to be determined; but the right to determine is derived from the statute. But this is a very different right from that sought to be drawn from a concession of power to enact a penal statute, under which the citizen may be indicted and punished. In respect to the vote to be taken, which, as I have said, is in effect but to agree or disagree to the proposed tax, the school districts may be assimilated to an aggregate corporation, which may levy a tax upon its members to meet corporate exigencies; but this must be by virtue of the charter or act of incorporation. The dissimilarity between such an expression of assent and that which has brought the plaintiff in error into the position of a criminal, is so obvious that it is unnecessary further to elaborate the argument upon this point.

But it is further urged that the act of Assembly in question is to be regarded, not as an act delegating the power of legislation, but as a conditional statute, to take effect or be void upon the happening of a contingency pointed out in the act itself. That the legislature may enact laws to take effect or expire at some future time, or upon a future event, is not to be denied. Our attention has been called to an instance of this kind, which, as it is supposed, proves the simply conditional character of the act of 1846. It is found in the legislation of Congress, prohibiting the introduction of British and French goods into the United States: unless these

nations would, respectively, modify their edicts interfering with neutral commerce. The first of these acts was passed in March, 1809, and was limited to expire on the last day of the then next session of Congress. On the 1st of May, 1810, Congress passed another act declaring that if either Great Britain or France should repeal or modify her edicts so that they should cease to violate the neutral commerce of the United States, the President should proclaim the fact; and in the event of the other nation not following the example, in three months thereafter, the interdictory sections of the act of 1809 should be revived in full force, or against the refusing nation; and that, as to the revoking nation, the restrictions imposed by the act of 1810 should cease from the date of the proclamation. In the case of The Aurora v. The United States, 7 Cranch, 382, the right of Congress to enact this law was called in question; but the Supreme Court of the United States held that Congress might extend and revive the act of 1809 conditionally: upon the occurrence of subsequent events, to be ascertained by the President's proclamation. It is plain the revival or continued suspension of the act of 1809 was not made to depend upon the proclamation, but upon independent facts, of which the proclamation was evidence; after which the statute operated *proprio vigore*. In commenting upon these enactments, Chief Justice Booth, in the opinion already adverted to, observes, "Had the President been empowered to repeal existing laws, and create a new law, by the exercise of his will, and to announce his decision by a proclamation, as the people of New Castle county were empowered to do by the legislature of this state, and to have their decision announced by the returns of an election, there would be an analogy between the two cases. Were it possible to suppose such an absurdity on the part of Congress, their act would have been declared void, which thus undertook to transfer the legislative power exclusively to the President, and so to abrogate the constitution." These remarks are applicable to our own act of Assembly; and to them may be added a notice of another and vital distinction between it and the legislation of Congress. In the latter instance, the power which created the law was exerted by the federal legislature, looking to no external aid; but the production of our Senate and House of Representatives came forth maimed, impotent, and functionless, until vivified by the popular breath. In the one case the decree is, this statute shall take effect in action, or its operation be suspended upon the occurrence of a particular event; in the other, this act shall be inoperative,

unless otherwise willed by the people. In the first case, the law remains quiescent until the happening of the appropriate event stirs it into motion; in the last, the so-called law was altogether without the power of motion, of itself, when it left the hands of the law-makers. And this is the distinction between a conditional law, properly so denominated, and an act of the law-making power seeking to transfer its functions to another. The one leaves nothing to be done to perfect the rule of action; the other but moulds the clay into shape, leaving to third persons the task of breathing into its mimic frame the energy of life. What is this more or better than simply preparing the *projet* of a law to be submitted for the sanction of a distinct and independent tribunal, whose will is to determine its future existence or continued nonentity?

Another supposed parallel to the act of 1846 is thought by the counsel of the Commonwealth to be found in the act of 14th April, 1835, which submitted to the citizens of the state the question whether a convention should be holden to propose and submit for their ratification or rejection a new state constitution. But very little reflection will satisfy the inquirer, that no such parallel exists. The question propounded for solution by the popular vote, did not pertain to the ordinary business of legislation, but referred itself, directly, to the eminent dominion which, as has been seen, resides only in the people, who are alone competent to decide upon any proposed modification of the fundamental law. The constitution of 1790 pointed out no particular mode by which an alteration of its provisions might be effected; and it was, therefore, convenient that the legislative body should indicate the manner in which the popular will might be manifested in respect to a subject which only the popular will was competent to deal with. An act of Assembly was not essential to this purpose, but simply convenient. Though enacted with all the forms of a law, it was not in truth a law; for it contained nothing binding or obligatory on the people, who were at liberty to obey or disobey it, as they saw proper. They might have moved without such an act; and its enactment, to regulate and direct the movement, certainly added nothing to its efficiency, other than as furnishing a means for ascertaining, with certainty, the public decision. The existence of the legislative resolutions neither added to, nor detracted from the force of the decision when made; nor did the resolution, as a legislative act, derive any superior sanction from the decision. One depended in no degree upon the other; but each was, in itself, perfect within its proper sphere. The legislature was powerless to

alter the constitution; but it possessed the right to invite the people to express their wishes on the subject. The people were unequal to an ordinary act of legislation; but they might, if they would, change the frame of their government. They did change it in some of its features; but this was done of their own absolute and inalienable power, and not by virtue of authority delegated to them by the legislature; for the act of the 29th March, 1836, providing for the call of a convention, was but the vehicle to carry the public wish into effect. There is, in fact, not the slightest resemblance between the initiatory legislative step which resulted in a change of the constitution, and that by which they called the people into legislative council. Indeed, so entirely dissimilar are the two cases, it is strange a likeness should have been imagined.

With a single exception, to be presently noticed, what has been said disposes of all that was urged upon the part of the Commonwealth, as tending to support the validity of the act of 1846. But since the argument of the case, it has been suggested, that instances of a valid delegation of legislative authority are to be found in the statutes made by Congress, from time to time, erecting portions of the public domain into territories, and organizing them for the purposes of government, by authorizing the appointment and election of executive, judicial, and legislative officers, and conferring on the latter the power to make laws, subject to the approval of Congress. It is true that, by these congressional acts, the legislative function is bestowed; and they therefore furnish examples of a delegation of legislative authority by a body which is itself subordinate. But the right to exercise this high power is expressly granted by the Federal Constitution; which, by art. 4, sect. 3, provides that "Congress shall have power to dispose of, and make all needful rules and regulations respecting the territory or other property belonging to the United States." Under this grant, which was, indeed, indispensably necessary for the proper disposition and regulation of the widely spread districts of country belonging to the Union, Congress has rightfully enacted the laws referred to; and yet, mindful of the elementary principle upon which the republic is based, they have always invested the people of the territories with the choice of the legislative agents.

As already intimated, there is a class of statutes, of modern origin, which it is difficult to recognise as being constitutionally made. I allude to a series of acts of Assembly, which seem to have originated as late as the year 1839, and been repeated, in successive years, down to the present. These provide all the de-

tails necessary for the erection and government of houses for the support and employment of the poor, in the county named in each of these acts, but close with a direction, that the question of erecting a poor-house shall be submitted to the decision, by ballot, of the people of the particular county; and according to the result of the vote, the act shall take effect or be null and void. Whether this provision can, in principle, be distinguished from that we have been reviewing, it is not now necessary to decide, and perhaps may never be. If it be unconstitutional, these acts, may be cited as showing how silently and insidiously a dangerous practice may creep, unnoticed, into the legislation of the state; but surely they cannot be called in to justify a continuance of the practice. Being limited in their objects and effects, they are perhaps no further injurious than as furnishing precedents of improper legislation, at first touching matters of small moment, but sure, in the end, to be extended to subjects of more general concern. It may be mentioned, as worthy of remark, that this species of legislation, if it can with propriety be so called, has grown into use within a very recent period; and, it is believed, until the passage of the act of 1846, was confined to objects of a local character, not calculated to awaken the general attention; and it is perhaps ascribable to this fact that they have been suffered to pass without complaint.

For the reasons which have been given, the court, after much reflection, and not without reluctance, is forced to the conclusion that, the act of Assembly, upon which the plaintiff in error stands convicted, is inoperative and void, and, consequently, does not warrant the judgment pronounced by the court below. It is, therefore, reversed, and the plaintiff in error is to be discharged without day.

BURNSIDE and COULTER, Justices, dissented.